**VIRGIN ATLANTIC AIRWAYS LIMITED, Plaintiff,**

v.

**BRITISH AIRWAYS PLC, Defendant.**

**No. 93 Civ. 7270 MGC.**

United States District Court,
S.D. New York.

Oct. 22, 1999.

Simpson Thacher & Bartlett, New York City, by Charles E. Koob, Joseph F. Wayland, Elizabeth A. Bassin, David E. Vann, Ann G. Rappleye, Nancy Hood, Kevin J. Horn, Michael L. Keeley, Linda M. Martin, for plaintiff.

Sullivan & Cromwell, New York City, by John L. Warden, John W. Dickey, Joseph E. Neuhaus, E. Marcellus Williamson, Tracy J. Bolotnick, Andrew C. Hruska, Christine C. Monterosso, Megan J. Shafritz, Timothy E. DiDomenico, for defendant.

## OPINION

CEDARBAUM, District Judge.

Virgin Atlantic Airways Limited ("Virgin") sues British Airways PLC for using incentive agreements that Virgin argues are anti-competitive. Virgin claims that the agreements have foreclosed its access to substantial passenger traffic, and that the foreclosure delayed its initiation of service between Heathrow airport and San Francisco and Washington, D.C.; deterred its initiation of service between Heathrow and Chicago; deterred its addition of a second Heathrow flight to Los Angeles; and deterred its addition of a third Heathrow flight to New York (JFK). Virgin charges British Airways with monopoly leveraging and attempted monopolization

in violation of Section Two of the Sherman Act, 15 U.S.C. § 2, arguing that British Airways used the incentive agreements to leverage or achieve monopoly power in the market for air travel to, through and from Heathrow airport. Virgin also claims that the incentive agreements unlawfully restrain trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1. British Airways moves for summary judgment on all the claims. For the following reasons, the motion for summary judgment is granted.

## BACKGROUND

Because this is British Airways' motion for summary judgment, the evidence is viewed in the light most favorable to Virgin, and all justifiable inferences are drawn in Virgin's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

British Airways began airline passenger service in 1939. It offers flights to 94 cities from its hub at Heathrow airport in London. (VA Ex. E; VA Tab 18 at BAL 0100572). Virgin started its operation in 1984. (Branson Decl. ¶ 7). Since then, Virgin has grown significantly and, at the close of discovery, was flying thirteen longhaul routes, including ten U.S.–U.K. routes, six of which were Heathrow-based. (BA Ex. H; VA Ex. W; Griffiths Decl. ¶ 3). Virgin entered the Heathrow routes to the following U.S. destinations in the following years: New York (JFK) in 1991–1992: Los Angeles in 1991–1992; Newark in 1992–1993; San Francisco in 1994–1995; Washington D.C. in 1996–1997; and Miami in 1997. (BA Ex. H).

Virgin claims that it would have initiated Heathrow service to Chicago, San Francisco, and Washington, D.C. and would have expanded its Heathrow service to New York (JFK) and Los Angeles earlier than it actually did if British Airways had not used the incentive agreements.

### A. Relevant Markets

British Airways assumes, for purposes of this summary judgment motion, that the product markets pleaded in the complaint—"Heathrow airport," (Compl. ¶ 56), "Gatwick airport," (Compl. ¶ 57), and scheduled airline passenger services between both city pairs and airport pairs, (Compl. ¶¶ 58–60)—are properly identified as such.

### B. British Airways' Dominance at Heathrow

It is undisputed that British Airways' share of the runway slots at Heathrow has remained approximately 39% since 1989. British Airways' next largest competitor, British Midland, controls approximately 13.5% of Heathrow slots. (VA Ex. C). Virgin controls approximately 1.9% of Heathrow slots. (*Id.*) The availability of slots at Heathrow over the past several years has been insufficient for any carrier to replicate British Airways' route network at Heathrow. (Griffiths Decl. ¶ 17).

As of July 1997, British Airways flies to 94 destinations from Heathrow. (VA Ex. E). Nineteen of those Heathrow routes are monopoly routes. (*Id.*) Three of the monopoly routes are to the U.S. (Detroit, Philadelphia, and Seattle) and the remainder are to cities in the U.K. and other countries (including, for example, Bologna, Italy; Dhahran, Saudi Arabia; Manchester, U.K.; Leipzig, Germany; Madras, India; Venice, Italy; and Newcastle, U.K.). (*Id.*) Forty-four of British Airways' Heathrow routes are duopolies. (*Id.*) On twenty-two Heathrow routes, British Airways competes with two other airlines, and on the remaining routes it competes with three or more airlines. (*Id.*)

British Airways serves between 43% and 45% of all Heathrow passengers, (VA Tab 18 at BAL0100584; BA Tab 11 ¶ 3), and accounts for 53% of all Heathrow transfers. (VA Tab 18 at BAL0100593).

British Airways' major U.S.–U.K. routes have historically been the key to its profit-

ability. British Airways has viewed its U.S.–U.K. routes as the "[m]ost important market we have," (VA Tab 31 at BA4598462), and its "largest profit center." (VA Tab 30 at BA0134815). It has regarded Virgin as a "cherry-picker" that targets the high-traffic U.S.–U.K. routes and thus skims off British Airways' best source of profits. (VA Tab 29 at BAL0135550; VA Tab 47 at BAL0135125; VA Tab 48 at BAL0073670).

The North Atlantic has become more competitive in recent years in terms of number of carriers and number of flights offered. (BA Tab 13 at 486–87). From 1986 to 1996, when competition on the North Atlantic routes starting growing, British Airways' fares on those routes dropped by 40 percent. (BA Tab 12 at 276–77; BA Tab 15 at 56).

## C. British Airways' Incentive Agreements

British Airways enters into incentive agreements with repeat customers who need air travel within British Airways' network. These customers fall into two main categories: travel agents (acting as aggregators of demand for individual customers) and corporate customers. The agreements with travel agents provide an extra commission payment each time an agent reaches a certain sales target. Similarly, the agreements with corporate customers give the customers special discounts each time their British Airways purchases reach a certain threshold level.

British Airways has used incentive agreements with travel agents and corporate customers since at least the mid–1980s. (Branson Decl. ¶ 3). British Airways' incentive agreements share several features: (1) they "bundle" routes by setting targets for purchases on all or a regional group of routes in British Airways' network rather than on a route-by-route basis; (2) they generally contain more than one target, and as the customer or travel agent meets higher targets, British Airways pays commissions and discounts that increase more than proportionally to the extra revenue that British Airways earns from the incremental purchases; and (3) they have dollar-one clauses which promise incentive payments "back to dollar one"—that is, not only on purchases beyond the target, but also on all purchases up to the target. (Bernheim Aff. ¶¶ 87–88, 92). The dollar-one clauses create a significant jump in the total incentive payment paid to a travel agent or corporate customer each time it meets a targeted level of purchases. (VA Ex. H; VA Tabs 145–147).

Some of the targets are market-share targets (i.e. targets based on British Airways' percentage share of the corporation's U.S.–U.K. flights). (Bernheim Aff. ¶ 89; BA Tab 30 ¶ 3 & Ex. A; BA Tab 31 ¶ 4). Others are total-revenue targets. (Bernheim Aff. ¶ 89; VA Tab 223 at BAL 1001588).

The geographic breadth of the corporate deals varies. Companies and travel agents which concentrate their travel on one route or region in British Airways' network often enter into "Focussed Route Deals" which provide an incentive payment if the company meets a threshold level of purchases on a single specified route (or small group of routes). (VA Tab 98 at BAL 0322872; VA Tab 236 at BAL 0560441). At the other end of the spectrum are "Global Deals" for travel agents and corporate customers which demand network-wide air travel from Heathrow. The Global Deals set one world-wide revenue target, many discrete regional or individual country targets, or some combination thereof. (VA Tab 241 at BAL 0385989; VA Tab 242 at BAL 0385934).

British Airways readily admits that it is "selling the network" by providing incentives based on network-wide usage rather than single route usage. (Feb. 13, 1998 Tr. at 42). Excerpts from British Airways' guidelines and memoranda on structuring incentive agreements suggest that British Airways considers the global and umbrella deals to be more effective than specific-route deals in generating additional ticket sales to customers with network-wide

needs. (VA Tab 179 at BAL 0322827; VA Tab 236 at BAL 0560441–42).

The incentive agreements are not exclusive dealing agreements by their terms, and do not require anyone to buy or sell any British Airways tickets, but merely provide larger commissions or discounts if the targets are met. (BA Tab 30 ¶ 2; BA 56.1 ¶ 40).

There is evidence that global incentive deals cause British Airways' revenue from globally-incentivized corporate customers to increase by 15% to 20% on average. (VA Tab 176 at BAL 0386090–154; VA Tab 177 at BAL 0313879; Bernheim Aff. ¶ 121 n. 67).

## D. Professor Bernheim's Expert Opinion

B. Douglas Bernheim is a Professor of Economics at Stanford University. (Bernheim Aff. ¶ 1). Virgin retained him in this case to analyze the competitive effect of British Airways' incentive agreements. After reviewing documents and data produced in discovery, Bernheim concludes, in his 84–page affidavit submitted in opposition to this summary judgment motion, that the incentive agreements are predatory.

Bernheim's affidavit describes in an overview fashion the calculations that he made in arriving at the conclusion that the agreements are predatory. The factual predicate for his calculations is that the incentive agreements have generated additional flights to carry the increased passenger load.

To support his premise that the incentive agreements have caused additional flights to be flown, Bernheim cites the deposition testimony of two British Airways executives. Robert Ayling, the chief executive of British Airways, testified to the effect that British Airways might fly fewer flights if it did not use the incentive agreements. (VA Tab 1 at 119–120). Charles Gurassa, British Airways's Director of Passenger and Cargo Business, testified that one of the advantages of the incentive agreements is that, if they attract more connecting traffic to British Airways, they give the company "the potential to mount either more services or more successful services." (VA Tab 7 at 169–171).

The above testimony does not state that the incentive agreements have actually caused British Airways to fly additional flights. Nonetheless, Bernheim relies on it as evidence that the incentive agreements have generated additional flights. (Bernheim Aff. ¶ 98). And although he does not expressly say so, he implicitly relies on this testimony as evidence that the incentive agreements have caused British Airways to operate at least some of the additional flights on the Heathrow routes to and from New York (JFK), Washington, D.C., San Francisco, Los Angeles, and Chicago.

Perhaps because he lacked the ability to identify which flights are the "additional" ones, since the only evidence that such flights exist is the vague testimony summarized above, Professor Bernheim makes a naked assumption that, as the incentive agreements increase British Airways' traffic, British Airways *proportionally* increases the number of regular flights it operates such that British Airways maintains the same average load factor across all routes—approximately 70%—that it has kept in the past.[1] (Bernheim Surreply Aff. ¶ 2 and ¶ 6 n. 2; Pindyck Decl. ¶ 21 and BA Tab BB). Bernheim explains that he is assuming that 30% of all seats are intentionally kept empty because British Airways has historically maintained a load factor of 70%, (*id.* at ¶ 2), and airlines generally want at least some empty seats available to accommodate unanticipated fluctuations in demand, (*id.* (citing Pindyck Decl. ¶ 41(c) ("[P]assenger demands fluctuate unpredictably from month to month . . . .")).

Bernheim illustrates his proportionality assumption as follows. He offers a hypothetical in which British Airways operates

---

1. "Load factor" is the percentage of occupied seats on an aircraft. (Griffiths Decl. ¶ 21).

one flight on each of ten routes. (Bernheim Surreply Aff. ¶ 6 n. 2). The load factors differ across routes but are 70% on average. (*Id.*) In the hypothetical, British Airways adopts an incentive scheme, expanding its traffic by 10% overall (the percentage may differ from route to route). (*Id.*) Bernheim's proportionality assumption is that British Airways will add (on average) one regular flight to one of the ten routes in this situation. (*Id.*) The one extra flight constitutes a 10% expansion of overall capacity, matching the 10% overall expansion of passengers, thereby keeping British Airways' overall load factor at 70%. (*Id.*) British Airways, he states, would probably add the new flight to a route with a high load factor or relatively more additional incentivized traffic. (*Id.*)

Because the proportionality assumption creates a causal link between the entire group of additional incentivized ticket sales and the additional flights, it permits Bernheim to attribute the costs and revenues of the additional flights solely to the additional incentivized traffic. Bernheim opines that *but for* the additional incentivized traffic, the extra flights would not be flown. He explains that his logic does not suppose that all and only the additional incentivized customers are actually sitting on the additional flights. (Bernheim Surreply Aff. ¶¶ 1–11). Regardless of the plane that an additional customer is flying on, Bernheim performs his calculations as if the customer were on one of the "additional" flights. By attributing the costs of the additional planes solely to the additional incentivized traffic, his calculations yield exactly the same profitability conclusion that one would arrive at if one were to make the admittedly unrealistic assumption that the extra flights carried all the additional passengers and only those passengers (and the regular flights carried all and only the original pool of traffic). (*Id.* at ¶ 9).

By attributing the entire cost of the incentivized bonus program to the additional flights only, Professor Bernheim calculates that the additional flights are flown below-cost. (Bernheim Aff. ¶¶ 78, 96–109 and VA Exhibit I). From this, he concludes that all the tickets sold to the additional customers are sold below cost.

Significantly, Bernheim's cost and revenue calculations are not based on data about actual flights flown on the five routes at issue and ticket sales to incentivized corporate customers and to non-incentivized customers through incentivized travel agents for air travel on those five routes. Instead, his calculations are based on the cost of an average flight (as a percentage of revenue brought in by the average flight), plus the average incremental cost (as a percentage of revenue) of paying incentive commissions and discounts to incentivized travel agents and corporate customers.

Bernheim opines that his calculations show that British Airways is engaging in predatory pricing "on the margin." (Bernheim Aff. ¶¶ 78, 96). That is, only the flights which would not be flown but for the extra traffic generated by the incentive agreements are operated below-cost. And derivatively, it follows that only the ticket prices for the additional traffic, whatever flight the additional customers may be flying on, are below cost. The price of tickets for the rest of British Airways' traffic are above cost.

According to Bernheim, by offering predatorily-priced tickets "on the margin," British Airways deters the efficient entry of competitors. (Bernheim Aff. ¶ 78). His one-sentence explanation is that rivals are limited by "slot constraints at Heathrow" to competing with British Airways "at the unprofitable margin." (Bernheim Aff. ¶ 79).

He avers that predatory pricing on the margin constitutes an anticompetitive practice that he calls "*predatory foreclosure.*" (Bernheim Aff. ¶ 67). He distinguishes the predatory foreclosure theory from the well-established concept of predatory pricing in a few respects. "First, the objective of predatory foreclosure is to deter and/or delay the entry or expansion of

a competitor, rather than to drive existing competitors from the market. Second, when a firm practices predatory foreclosure, it *immediately* recoups its losses on the sales that are priced below cost by setting prices substantially in excess of costs on other sales." (*Id.*) Third, profitable predatory foreclosure does not require the same economic preconditions as profitable predatory pricing, that is, it does not require barriers to entry (or reentry) by competitors. (*Id.*) at 40 n. 45.[2]

To show that predatory foreclosure has injured Virgin, Professor Bernheim reconstructed what Virgin's route entry and expansion decisions would have been in the mid–1990s if British Airways had not predatorily priced the tickets for additional incentivized travel.[3] (Bernheim Aff. ¶¶ 126–132). Based on this reconstruction, he opines that, without the predatory effect of the incentive agreements, Virgin's profitability studies would have anticipated enough additional business on the five Heathrow routes at issue to cause Virgin to enter them earlier than it actually did. (Bernheim Aff. ¶ 132). Specifically, the better forecasts would have induced Virgin to:

(1) initiate service to San Francisco in 1992 instead of 1994,

(2) initiate service to Washington, D.C. in 1995 instead of 1996,

(3) initiate service to Chicago in 1996,

(4) add a second flight to Los Angeles in 1996, and

(5) add a third flight to New York (JFK) in 1997.

(Bernheim Aff. ¶ 132; VA Ex. L).[4]

British Airways attacks Bernheim's expert calculations and final opinion on the ground that they are not based on facts about the existence of additional flights and the flights on which the additional customers are flying. British Airways suggests that, because 30% of the seats on a typical British Airways flight are empty, it is improper to calculate the profitability of tickets sold to the additional passengers by assuming that they all fly on the extra flights. Given the 30% average extra capacity, British Airways argues, it may be inferred that it has accommodated many additional customers on the five routes at issue without adding new flights.

British Airways persuasively argues that Virgin has not shown that it can prove that British Airways engaged in predatory or otherwise anticompetitive conduct.[5]

## DISCUSSION

### A. Summary Judgement Standard

Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The judge's role in

---

2. It would seem that, under Virgin's "predatory foreclosure" theory, any volume price discount would be assailable as "predatory" because it would deter some competitors from entering the market. However, deterring the market entry of some competitors is a natural product of legitimate competition where the non-entry results from their inability to compete efficiently on the merits. P. Areeda & D. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 HARV.L.REV. 697, 704–06 (1975). British Airways argues that Virgin's theory of predatory foreclosure should be rejected as a matter of law, but there is no need to decide that question.

3. Virgin's Executive Director, Commercial, Paul D. Griffiths, reviewed the assumptions that Professor Bernheim made in reconstructing Virgin's route-entry decisions, and concluded that Bernheim's approach "accurately reflects the methodology that Virgin uses in its route evaluation and planning process...." (Griffiths Decl. ¶ 30).

4. Three of the route entry deterrences identified by Bernheim are in 1996 and 1997. However, Virgin stated at oral argument that it is only seeking recompense for the period 1991–1995. (Feb. 13, 1998 Tr. at 21).

5. British Airways makes several additional arguments which are not reached in this opinion.

summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This requires that the party opposing summary judgment "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"[S]ummary judgment is an important procedural device in antitrust cases, because it enables courts to efficiently resolve potentially costly and time-consuming litigation which can chill competitive forces." *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 55 (2d Cir.1997). In the context of antitrust litigation, the range of inferences that may be drawn from ambiguous evidence is limited; the party with the burden of proof must proffer evidence that tends to preclude an inference of permissible conduct. *Id.*

Virgin relies predominantly on the opinion of its expert economist, Professor Bernheim, and has not proffered evidence that tends to preclude an inference of permissible conduct. As is explained below, Bernheim's opinion is not evidence that the agreements create predatory discounts because it is based on assumptions that have not been supported by market data.

*B. Monopolization: Sherman Act Section Two*

Section Two of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 2. Virgin argues that British Airways violated Section Two by engaging in monopoly leveraging and attempted monopolization. It contends that British Airways used the incentive agreements to leverage its monopoly power in various, unspecified Heathrow route markets to the five U.S.—Heathrow routes in question [6] and also that British Airways used the incentive agreements in an attempt to monopolize the Heathrow market.

 There are two elements of a Section Two claim: "1) the possession of monopoly power in the relevant market and 2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a su-

---

**6.** Virgin takes the position that British Airways "is always leveraging its monopoly power from the routes that do not face imminent entry to the competitive route that does face imminent entry by a rival where the actual identity of this competitive route is entirely flexible, and depends upon where [British Airways'] rival chooses to use its incremental slot." (Bernheim Aff. at 40 n. 46). Virgin's elusively phrased argument is that British Airways is leveraging profits on its collection of uncompetitive routes (Heathrow to Leipzig and Venice, for example) in order to charge below-cost prices on certain of its competitive transatlantic flights (Heathrow to New York, for example).

The routes on which British Airways has a capacity or market share of 60% or more account for approximately 17% of British Airways' overall available seat kilometers and approximately 17% of its revenue passenger kilometers. (BA Tab QQ; BA Tab 227). Thus, British Airways argues that "Virgin's theory ... requires that this small [17%] 'monopoly' tail has for the last eight years wagged the competitive dog." (BA Reply Mem. at 52). British Airways contends that it is illogical to argue that the limited traffic on its monopoly routes could give it significant "leveraging" power over the much larger amount of traffic on the more competitive U.S.–U.K. portion of its network.

The merits of this argument need not be reached on this motion.

perior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Applying this basic standard, the case law reflects that both the monopoly leveraging claim and the attempted monopolization claim require, inter alia, a showing that British Airways engaged in predatory or otherwise anticompetitive conduct. *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 276 (2d Cir.1979) (monopoly leveraging); *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (attempted monopolization).

### 1. Predatory Foreclosure

■ While Virgin's theory of predatory foreclosure is an interesting one, Virgin has not shown that, in fact, more flights were flown to accommodate the additional incentivized passengers on the five routes between Heathrow and New York (JFK), Los Angeles, San Francisco, Washington D.C., and Chicago. The linchpin in Virgin's evidentiary submissions on the predatory foreclosure theory is Bernheim's opinion. However, an expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case.

■ The Supreme Court has made clear that in antitrust cases, "expert opinion evidence ... has little probative value in comparison with the economic factors" that may dictate a particular conclusion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 n. 19, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (granting summary judgment in a predatory pricing case). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (rejecting an expert's conclusion that the defendant's price discrimination was likely to injure competi-

tion in the relevant market). "As *Brooke Group* makes clear, expert testimony without ... a factual foundation cannot defeat a motion for summary judgment." *Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1198 (3d Cir.1995); *see also Ortho Diagnostic Systems, Inc. v. Abbott Labs., Inc.,* 920 F.Supp. 455, 471 (S.D.N.Y. 1996) ("In order to defeat a properly supported motion for summary judgment, a party may not rest on economic theories that may or may not apply to the facts of the case or on conclusory or incomplete expert analyses any more than it may rest on unsubstantiated allegations of its pleadings."); *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

While there are several evidentiary gaps in Bernheim's opinion, the most fundamental is his premise that extra flights are being flown that are wholly attributable, in terms of cost and revenue, to all and only the additional traffic generated by the incentive agreements.

As was discussed above, the only evidence that extra flights have been generated by the incentive agreements is the vague and fairly obvious testimony of the two British Airways executives that, if British Airways' traffic declined as a result of discontinuing the incentive program, British Airways might operate fewer flights, and if the traffic increased, British Airways might operate more flights. This testimony provides inadequate basis for Bernheim's assumption that the cost of flying all the additional travelers should be computed as if they were all flying on additional flights, rather than on the regular flights that, over the past years, have operated at only 70% capacity on average. Certainly, the testimony reveals nothing about whether flights have been added on the five routes in question, or the reasons therefor.

Relatedly, the fact that British Airways' load factor has remained quite consistently

at approximately 70% is not evidence that as customer traffic across several different routes increases, the total number of flights increases in a strictly proportional fashion. And even if it were, it would not support Bernheim's approach of calculating the profitability of flying the incremental incentive customers as if they were all sitting on the additional flights. Bernheim's opinion should be based on actual flight and passenger data for the years in question, rather than theory-grounded assumptions and average figures. In addition, because Virgin claims injury on five particular routes, its case should be supported by data specific to those five routes. British Airways operates flights to 94 cities from Heathrow. Bernheim's implicit assumption that the additional flights, assuming they exist, are attributable to a growth in incentivized traffic on the five particular routes, without the support of any direct evidence about changing traffic patterns on these routes, is mere speculation.

The issue of whether British Airways is selling below-cost tickets to marginal passengers on the five routes at issue in this case is a fact-rooted question as to which Virgin has not submitted direct evidence. Without supporting market data, Bernheim's expert opinion would not be sufficient evidence to prevent a directed verdict against Virgin at the close of Virgin's prima facie case on the predatory foreclosure theory.

### 2. Bundling

■ Apart from the predatory foreclosure analysis, Bernheim discusses the potentially harmful "bundling" aspects of the incentive agreements. (Bernheim Aff. ¶¶ 73–75, 83–95). Specifically, a hypothetical example in Bernheim's opinion shows that the bundling feature in the incentive agreements can cause an incentivized customer who flies on routes on which British Airways has a monopoly as well as routes on which British Airways faces competition to fly with British Airways on the competitive routes even when the competing carrier's service is less expensive. (Bernheim Aff. ¶¶ 76, 95). Seizing on this part of Bernheim's opinion, Virgin argues that under *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir.1978)[7] and *Ortho Diagnostic Systems, Inc. v. Abbott Labs., Inc.*, 920 F.Supp. 455 (S.D.N.Y.1996)[8], it has shown an anticompetitive effect of the incentive agreements.

Significantly, however, Bernheim cites no supporting consumer-purchasing data to convert his theorizing about the harmful aspects of British Airways' bundling into a factually-grounded opinion. The bundling aspect of this case is more complex than in *SmithKline* or *Ortho* because each travel agent and corporate customer chooses the flights that are in its bundle. Thus, each bundle is unique. The ratio of monopoly-route flights to competitive-route flights within a bundle will vary by travel agent and corporate customer, and will vary year by year. Some bundles may contain no

---

**7.** In *SmithKline*, the Third Circuit held that the defendant pharmaceutical company, Lilly, had violated Section Two of the Sherman Act by bundling the sale of its high-volume monopoly cephalosporin antibiotics (Keflin and Keflex) with the sale of its competitive cephalosporin (Kefzol). It affirmed the district court's holding that Lilly's discount scheme transgressed Section Two of the Sherman Act because it effectively bundled three products together such that, when the discount for all three products was attributed to the one competitive product in the bundle, that product was being sold at a price that would drive SmithKline out of the market. *SmithKline*, 575 F.2d at 1065.

**8.** *Ortho* is a more recent case in which the defendant offered monopoly products with competitive products in a bundle that was priced at a discount relative to the prices at which the products were offered for sale individually. The *Ortho* court held that there would be an antitrust violation if the competitive product in the bundle were sold for a price below average variable cost after the discounts on the monopoly items in the bundle were subtracted from the price of that competitive product. *Ortho*, 920 F.Supp. at 467–69.

monopoly routes at all. In addition, the terms of the incentive agreements vary widely, since each is somewhat tailored to the travel interests of the relevant travel agent or corporate customer. Some agreements are regional; others are global. They set different sales targets and discount rates. Given the variety of flight bundles and incentive packages offered, it would be pure speculation to draw a conclusion about whether the discounted bundling results in predatory pricing of travel on competitive Heathrow routes unless the conclusion were based on market data.

Notably absent from Bernheim's opinion and the remainder of the record is an analysis of any particular customer's flight options and incentives, or any evidence of similar detail and substance, showing that flying on Virgin on a particular route at a particular time would be economically irrational for that customer regardless of Virgin's competing price because of the customer's Heathrow network needs and the incentive bonus available from British Airways.

The affidavit of Kevin Mitchell, the president of a business travel purchasing and advocacy group, is the only other evidence that Virgin proffers in support of the bundling theory in this case. Mitchell's affidavit, however, suffers from the same flaw as Bernheim's opinion. Mitchell states that, based on his personal experience in the business travel industry, "If [a] company is locked into a [British Airways network-based incentive] contract, it is simply economically irrational for it to purchase tickets from lower-fare competitors [because] the company puts its incentive payment at risk with every purchase of a ticket from [British Airways'] competitors, even if that competitor offers better service or lower prices ..." (Mitchell Aff. ¶ 19). There is no indication in Mitchell's affidavit that he reviewed actual British Airways incentive agreements and the Heathrow flight needs

of any corporate customer. Like Bernheim, Mitchell simply assumes the negative bundling facts that Virgin is required to show.[9]

Conclusions about how consumer choices have actually been affected by British Airways' incentive agreements cannot be drawn without information about actual consumer flight needs, travel rates, incentives offered, and flight costs. Since Virgin has produced no such evidence, it cannot meet its burden of proof on the bundling theory.

Because Virgin has failed to show a factual basis for either its predatory foreclosure theory or its product bundling theory with respect to the five Heathrow routes at issue, it has failed to raise a genuine issue of disputed fact with respect to its Section Two claims.

*C. Agreement in Restraint of Trade: Sherman Act Section One*

■ Section One of the Sherman Antitrust Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 1. Virgin argues that the incentive agreements are unlawful because they predatorily foreclose competition in providing air travel service to travel agents and corporate customers in the Heathrow market.

Virgin initially cast its Section One claim as one for exclusive dealing, but stated at oral argument that it has abandoned exclusive dealing as the basis for the alleged violation of Section One. (2/13/1998 Tr. at 36). Virgin now presents its Section One claim as a general claim for restraint of trade and contends that British Airways' incentive agreements violate Section One because they amount to an unreasonable restraint on competition.

9. Mitchell states that while he was employed during the late 1980s and early 1990s at CIGNA Corporation, he negotiated several incentive agreements with "airlines such as BA." (Mitchell Aff. ¶ 3). He does not say that any

British Airways incentive agreement had the effect of forcing CIGNA to buy all or any of its Heathrow tickets from British Airways when competitors offered better fares.

As Virgin concedes, (VA Mem. at 92), the incentive agreements do not provide for any of the types of restraints that have historically been condemned as illegal per se, such as price fixing, market divisions, tying arrangements, or boycotts. Therefore, the summary judgment evidence must be examined in accordance with "rule of reason" analysis. *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 56 (2d Cir. 1997); *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.*, 996 F.2d 537, 542–43 (2d Cir.1993) (observing that most cases fall outside the narrow, carefully demarcated categories held to be illegal per se).

 Under the rule of reason, whether the restraints in the incentive agreements are reasonable depends on their actual effects on the market and their pro-competitive justification. *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir.1995). "Establishing a violation of the rule of reason involves three steps." *K.M.B.*, 61 F.3d at 127. First, the "[p]laintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market...." *Id.* If the plaintiff carries its burden, the burden shifts to the defendant to establish the pro-competitive redeeming virtue of the action. Should the defendant carry this burden, the plaintiff must then show that the same pro-competitive effect could be achieved through an alternative means that is less restrictive of competition. *Id.* Ultimately, the goal is to determine whether restrictions in an agreement among competitors potentially harm consumers. *Clorox*, 117 F.3d at 56.

For the reasons discussed in the Section Two analysis, Virgin has not carried its initial burden under Section One of showing that the challenged incentive agreements have had an actual adverse effect on competition as a whole in the relevant market.

## CONCLUSION

Virgin has not raised a genuine issue of disputed fact that the incentive agreements have injured competition in the market for passenger air travel between Heathrow airport and New York (JFK), Los Angeles, San Francisco, Washington D.C., or Chicago. Accordingly, British Airways' motion for summary judgment is granted.

SO ORDERED.